(114 So. 696)

No. 28696.

STATE v. FOSTER.

Oct. 31, 1927.

*(Syllabus by Editorial Staff.)*

1. **Criminal law** ☞274—**Motion to quash indictment need only be filed with permission of court before trial, and does not require withdrawal of plea of not guilty (Act No. 135 of 1898, § 16).**

Plea of not guilty need not be withdrawn for purpose of filing motion to quash indictment, which motion need only be filed with permission of court before entering on trial under Act No. 135 of 1898, § 16, and hence refusal to permit withdrawal of not guilty plea for such purpose was not error.

2. **Criminal law** ☞274, 1149—**Withdrawal of not guilty plea is within trial judge's discretion, not to be disturbed in absence of abuse.**

Withdrawal of plea of not guilty is matter within discretion of trial judge, and his ruling thereon will not be disturbed unless an abuse of discretion is shown.

3. **Jury** ☞59(2)—**Title to office and acts of "de facto jury commissioner" cannot be inquired into collaterally (Act No. 135 of 1898, § 3).**

Where jury commissioner, appointed under provisions of Act No. 135 of 1898, § 3, has qualified by taking oath prescribed by law, and is in actual possession of office under color of right, he is jury "commissioner de facto," if not de jure, and title to his office and his acts as such officer cannot be inquired into collaterally.

4. **Indictment and information** ☞137(2)—**Drawing grand juries within intervals of six months impaneled shortly after predecessors served six months, held proper and not ground for quashing indictment (Act No. 23 of 1908, repealing Act No. 135 of 1898, § 6).**

Under Act No. 23 of 1908, repealing Act No. 135 of 1898, § 6, drawing of grand juries under court orders, entered at intervals of about six months, in no instance less than for six months, and in every instance impaneled within few days after previous grand jury had served six months, was proper, and did not warrant quashing of indictment on ground that more than six months elapsed between drawings of jury.

5. **Jury** ☞59(1)—**Clerk of court is ex officio jury commissioner, not required to take special oath to serve as commissioner.**

Clerk of court may serve as jury commissioner before taking prescribed oath as such, since clerk is ex officio a jury commissioner and not required to take special oath.

6. **Names** ☞16(2)—**Misspelling of juror's name by erroneous substitution of letters, not changing sound thereof, held "idem sonans" and no ground for quashing venire.**

Erroneous substitution of improper letter in spelling of proper name, which does not change sound thereof, is merely "idem sonans," and hence spelling of names of petit jurors on venire list as "Acklin," correctly spelled "Acklen," and "Faust," correctly spelled "Foust," was not ground for motion to quash venire.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Idem Sonans.]

**7. Criminal law ⟨key⟩1166½(8)—Overruling challenge for cause to juror peremptorily challenged by defendant not exhausting peremptories, if error,. was not prejudicial.**

Overruling of challenge for cause of juror, if error, was not prejudicial, where such juror was peremptorily challenged, and when jury was completed defendant had not exhausted peremptory challenges allowed by law.

**8. Jury ⟨key⟩79(3)—Defendant's right in impaneling of petit jury is not one of selection but of rejection of jurors biased, prejudiced, or incompetent.**

In impaneling of petit jury, defendant's right is one of rejection rather than selection, and defendant may exclude from panel for cause a biased, prejudiced, or incompetent juror.

**9. Criminal law ⟨key⟩1166½(7)—Defendant cannot be prejudiced by rejection of juror, though judge errs in sustaining challenge for cause to juror.**

Rejection of jurors whose competency is questioned cannot prejudice defendant, though judge errs in sustaining challenge to juror for cause; error being merely one of judgment in exercise of judicial discretion.

**10. Criminal law ⟨key⟩1165(1)—Ruling of trial judge, not injuriously affecting defendant, cannot be complained of.**

Defendant will not be heard to complain of ruling of trial judge which does not affect him injuriously.

**11. Criminal law ⟨key⟩447—Coroner's testimony as to defendant's statement held not objectionable as contradicting coroner's written report or procès verbal, where no report was made and other testimony thereof was admitted without objection.**

In prosecution for murder, question to coroner whether defendant stated that, when deceased reached for his pistol, he drew it half out, was not objectionable as an attempt to contradict written report or procès verbal of coroner, where no inquest was held and there was no procès verbal showing report of coroner, and defendant's statement was testified to without objection by other witnesses.

**12. Witnesses ⟨key⟩240(4)—Question to witness whether he saw defendant when he left house held not objectionable as leading.**

In prosecution for murder, question to witness, "Did you see defendant when he left up

there at the house?" did not suggest answer desired, and was not objectionable as leading.

**13. Criminal law ⟨key⟩419, 420(1)—Redirect examination on what took place between witness and defendant, gone into by defendant on cross-examination, held not objectionable as irrelevant and hearsay.**

In prosecution for murder, question to witness as to what took place between witness and defendant *held* not objectionable on ground that anything other than what was gone into by defendant would be irrelevant and hearsay, where question was asked on redirect examination on matters gone into by defendant on cross-examination.

**14. Homicide ⟨key⟩169(2)—Testimony as to length of time deceased's father lived in community held admissible to rebut defendant's proof that deceased occupied father's farm without authority.**

In prosecution for murder, testimony by witness as to length of time deceased's father had lived in that community was not objectionable as irrelevant, but was admissible in rebuttal of defendant's proof that deceased occupied father's farm without authority.

**15. Homicide ⟨key⟩169(1)—Witnesses ⟨key⟩240(4) —Question whether neighbors were far apart held admissible to show circumstances surrounding killing on farm, and was not objectionable as leading and irrelevant.**

In prosecution for murder, question to witness whether neighbors were pretty far apart was not objectionable as leading and irrelevant, but admissible to show circumstances surrounding killing which occurred in country on farm of deceased's father.

**16. Homicide ⟨key⟩169(2)—Question as to how many children deceased's father had held admissible to rebut defendant's contention that deceased occupied father's farm without authority.**

In prosecution for murder, question as to how many children deceased's father had by his second wife was admissible to rebut defendant's contention that deceased occupied his father's farm without authority.

**17. Criminal law ⟨key⟩419, 420(1)—Cross-examination of witness to show what deceased's father, not called as witness, testified to on defendant's preliminary trial as to deceased's unruly character, held inadmissible as hearsay.**

In prosecution for murder, cross-examination by defendant of witness to show what de-

ceased's father had sworn to on preliminary trial of defendant relative to unruly character of deceased when he was a boy was properly excluded as hearsay, where father was not called as witness.

**18. Criminal law ⟨key⟩1170½(3)—Bill of exceptions to overruling objection to question not shown to have been answered, but showing similar questions answered, did not show error.**

Bill of exceptions to overruling of defendant's objection to question to witness as to what he meant when he told defendant that deceased was dangerous man did not show error, where it appeared from per curiam that question objected to was not answered and similar questions were answered.

**19. Witnesses ⟨key⟩287(4)—Question as to what witness meant when he told defendant deceased was dangerous man, admitted to allow witness to explain testimony, held proper.**

In prosecution for murder, overruling of defendant's objection to question to witness as to what he meant by dangerous man, when he told defendant deceased was dangerous man, was proper, where question was admitted merely to permit witness opportunity to explain his testimony, and in answer witness merely restated conversation with defendant, without giving own opinion.

**20. Witnesses ⟨key⟩219(2)—Testimony by defendant's wife as to private conversations with defendant, admitted without objection, held proper (Act No. 157 of 1916, § 1).**

In prosecution for murder, motion to strike from record testimony by defendant's wife relative to what defendant might have said or told her in private conversations as being privileged communications, admitted in violation of Act No. 157 of 1916, § 1, was properly overruled, where wife, sworn as witness, was informed that she could not be compelled to testify, but voluntarily submitted herself as witness, and her testimony was not objected to by defendant, who cross-examined wife on all matters gone into by state and then moved to strike only when he discovered that wife's testimony was unfavorable.

**21. Witnesses ⟨key⟩188(1), 220—Disclosure of communication between defendant and wife is not prohibited, but communications may be excluded on timely objection by spouse in whose favor privilege exists (Act No. 157 of 1916, § 1).**

Act No. 157 of 1916, § 1, protecting communications by one spouse to other in confidence of marital relation from disclosure, does not prohibit disclosure of such communication, but merely confers privilege of exercising right to exclude or admit communications in evidence, and requires timely objection to testimony in order that privilege be enforced.

**22. Witnesses ⟨key⟩219(1)—Person in whose favor privilege created by law exists may waive it.**

Where law creates a privilege, person in whose favor privilege exists may waive it.

**23. Criminal law ⟨key⟩693—Admissibility of testimony cannot be objected to after testimony has gone to jury.**

Objection to admissibility of testimony comes too late after testimony has gone to jury.

**24. Criminal law ⟨key⟩1170(4)—Bill of exceptions to sustaining objection to question repeated without objection and answered by witness did not show error.**

Bill of exceptions to sustaining of state's objection to question asked of defendant's wife while being cross-examined by counsel for defendant did not show error, where question was repeated without objection thereto, and witness answered question.

**25. Criminal law ⟨key⟩361(1)—Redirect examination by state of defendant's wife, whether she made statements written by her in tablet after killing, held admissible to rebut defendant's cross-examination indicating statements were made as facts.**

In prosecution for murder, question by state to defendant's wife, whether she ever made any statements such as were written by her in tablet after killing, was not objectionable as being irrelevant and hearsay, but was admissible on redirect examination to correct impression created by defendant's cross-examination that statements written by defendant's wife were made as facts, and to show all facts concerning such written statements.

**26. Homicide ⟨key⟩156(1)—Question to defendant's wife as to what deceased was doing when she saw him was admissible to show malice and not objectionable because witness saw deceased about eight hours before killing.**

In prosecution for murder, question by state to defendant's wife as to what deceased was doing when she saw him was not objectionable as irrelevant because witness saw de-

ceased between 8 or 9 o'clock and killing did not occur until 5 o'clock that afternoon, but was admissible for purpose of showing malice.

**27. Homicide** ⊚➝158(1)—**Question to witness as to threats by defendant to deceased shortly before killing held admissible to show malice and not objectionable for failure to prove time and place.**

In prosecution for murder, question to witness as to threats made by defendant against deceased shortly before killing was not objectionable for failure to prove time and place, but was admissible solely for purpose of showing malice.

**28. Criminal law** ⊚➝1170(4)—**Objection to exclusion of testimony was without merit, where testimony was subsequently admitted on proper foundation being laid.**

Bill of exceptions to court's refusing defendant right to question witness relative to character of deceased for peace and quiet, based on ground that no foundation had been laid for admission of proposed testimony, *held* without merit, where proper foundation was subsequently laid and testimony admitted.

**29. Witnesses** ⊚➝277(4)—**Cross-examination of defendant as to starting point of trouble with deceased was admissible in rebuttal, though not directly referred to in defendant's direct testimony.**

In prosecution for murder, cross-examination by state of defendant as to what seemed to have been starting point of trouble between defendant and deceased was not objectionable as relating to matter not gone into by defendant on direct examination, and as not attacking credibility of witness, where testimony sought to be elicited was in rebuttal of testimony in chief by defendant as to how killing to which there were· no eyewitnesses occurred.

**30. Witnesses** ⊚➝337(6)—**Cross-examination of defendant as to whether there was charge of bigamy against him was admissible in murder prosecution to test credibility, where knowledge of charge was denied.**

In prosecution for murder, question to defendant on cross-examination, whether there was charge of bigamy against him in court, was not objectionable as being irrelevant and not creating presumption of guilt or testing witness' credibility, where witness had·stated he did not know existence of such charge, and hence question was permitted to test his credibility.

**31. Witnesses** ⊚➝274(1)—**Question whether witness knew deceased's reputation for peace held not objectionable for failure to lay proper basis therefor.**

In prosecution for murder, question to witness whether he knew ·deceased's reputation in community for peace and quiet was not objectionable for failure to lay proper basis therefor, since question merely called for "Yes" or "No" answer, and subsequent testimony on reputation of deceased was admitted without objection.·

**32. Criminal law** ⊚➝419, 420(12)—**Document offered by defendant, not part of coroner's procès verbal, containing statement by coroner ·and partial ·statement of defendant not under oath as to cause of killing held properly excluded.**

In prosecution for murder, document offered by defendant, not purporting to be procès verbal of inquest by coroner, but merely containing statement by coroner as to cause of death and partial statement by defendant not under oath as to cause of killing was properly excluded.

**33. Witnesses** ⊚➝188(2)—**Question to defendant's wife as to whether she remembered where defendant was three days before killing was not privileged.**

In prosecution for murder, question by state to defendant's wife as to whether she remembered what defendant did and where he was on Saturday before killing, which took place on Tuesday, was not objectionable as coming under rule governing· privileged communications, since it did not relate to private communication between defendant and wife, and wife waived right to refuse to testify, becoming competent witness.

**34. Homicide** ⊚➝169(1)—**Witnesses** ⊚➝321— **Question to defendant's wife, whether she remembered where defendant was three days before killing, held admissible to rebut defendant's statement, and was not objectionable as impeaching state's own witness.**

In prosecution for murder, question by state to defendant's wife, whether she remembered what defendant did and where he was on Saturday morning before killing occurring on Tuesday, was not objectionable on ground that matter had been gone into on direct and cross-examination of witness, and that state could not impeach its own witness, but was admissible to rebut defendant's statements relative to conversations with deceased at his home on

Saturday morning, by showing defendant was not then at home.

**35. Criminal law ⚖=1036(9)—Bill of exceptions to question, objection to which was sustained and instruction thereon not requested, presented nothing for review.**

Bill of exceptions to question put to witness by state, to which objection was sustained and no request made to instruct jury regarding matter, presented nothing for review.

**36. Homicide ⚖=169(1)—Question as to when defendant left witness' home was admissible to rebut defendant's statement that deceased was then at his home.**

In prosecution for murder, question by state as to time when defendant left witness' house on certain day was not objectionable as not being in rebuttal of any testimony by defendant, where it rebutted defendant's contention that deceased was at his house at such time and made threats to kill him.

**37. Criminal law ⚖=665(4), 1153(5)—Permission to call as character witness person not excluded from courtroom with witnesses held within trial court's discretion, not to be interfered with without abuse.**

Where all witnesses in prosecution for murder were placed under rule and excluded from courtroom, permission to call person as character witness who was not summoned as witness in case, and who had been in court during trial, was matter within discretion of court, and exercise of such discretion will not be interfered with unless discretion was abused or exercised in arbitrary or capricious manner.

**38. Constitutional law ⚖=266—Refusal to strike wife's testimony, not objected to by defendant, held not denial of due process (Const. U. S. Amend. 14; Const. 1921, La. art. 1, § 2).**

In prosecution for murder, refusal to strike testimony by defendant's wife as to private communications with defendant was not denial of due process of law in violation of Const. U. S. Amend. 14, and Const. 1921, La. art. 1, § 2, where defendant waived privilege of excluding such communications by failing to object to admission of communications and cross-examining witness thereon.

**39. Criminal law ⚖=1090(18)—Overruling motion to correct per curiams cannot be considered, where no bill of exceptions to ruling on motion was tendered judge.**

Where defendant, prosecuted for murder, filed motion to have court correct its per curiams to bills of exception, overruling of such motion by court cannot be considered, where no bill of exceptions was prepared and tendered to judge for signature on such ruling.

Appeal from Second Judicial District Court, Parish of Claiborne; John S. Richardson, Judge.

S. D. Foster was convicted of murder, and he appeals. Affirmed.

Wimberly & Wallace, of Arcadia, for appellant.

Percy Saint, Atty. Gen., W. D. Goff, Dist. Atty., of Arcadia, E. R. Schowalter, Asst. Atty. Gen. (T. T. Land, of Homer, of counsel), for the State.

BRUNOT, J. The defendant was indicted for murder. He was arraigned, tried, found guilty as a charged without capital punishment, and was· sentenced to life imprisonment, at hard labor, in the state penitentiary. From the judgment and sentence he appealed.

There are thirty-two bills of exception in the record.

[1, 2] Bill No. 1 was reserved to the refusal of the court to permit defendant to withdraw his plea of not guilty for the purpose of filing motions to quash the indictment. It is not necessary that the plea should be withdrawn. All that the law requires is that the motion should be filed with the permission of the court and be urged before entering upon the trial. Section 16 of Act 135 of 1898; Marr's Crim. Jurisprudence (2d Ed.) vol. 1, p. 648; State v. White, 153 La. 300, 95 So. 776; State v. Jenkins, 160 La. 757, 107 So. 564. The withdrawal of the plea of "not guilty" is a matter within the discretion of the trial judge, and his ruling will not be disturbed unless an abuse of discretion is shown. State v. Boudreaux, 137 La. 227, 68 So. 422; State v. Hadad, 142 La. 69, 76 So. 243; State v. Gunn, 147 La. 373, 85 So. 44; State v. Sandiford, 149 La. 933, 90 So. 261; State v. Foster,

150 La. 971, 91 So. 411. The judge, in his per curiam to the bill, says:

"The court overruled the motion for the reason that the defendant, though he had ample time and opportunity to have filed any motion he desired before arraignment, he waited until the day of trial to do so, and the court felt that it would have been an abuse of the discretion vested in it to have allowed the motion and thereby delay the trial. Defendant was permitted to file his motion to quash, and same was tried on its merits, and the court overruled the motion."

It is clear that the defendant was denied no legal right, and there is no merit in this bill.

Bill No. 2 was reserved to the overruling of defendant's motion to quash the indictment. The motion is a lengthy document; it alleges, in substance:

First. That the grand jury was selected by the jury commission from the names of jurors in the general venire box, after supplementing names to take the place of jurors who had become disqualified, and that the list of jurors in the general venire box, as thus supplemented, contained names of jurors who were drawn and their names placed in the general venire box, from time to time, by the jury commission, at its previous sessions, during the years 1921, 1922, 1923, 1924, 1925, and 1926.

Second. That B. H. Moore, one of the jury commissioners, participated in supplementing and revising the list of jurors in the general venire box and in the drawing of juries, at the sessions of the commission, during the years 1925 and 1926, while the said B. H. Moore was holding the office of deputy registrar of voters, and, while acting in said dual official capacity, the names of L. L. Sherman and J. M. Lindenmaier, two of the grand jurors who indicted defendant, were placed in the general venire box by the jury commission; and that D. W. Knighton, one of the jury commissioners, ipso facto vacated the office of jury commissioner, by qualifying as justice of the peace, but, thereafter participated in the acts and doings of the jury commission at the sessions of that body during the year 1924, and that the general venire list, on February 21, 1927, contained names therein that were placed in the general venire box by the jury commission at its sessions in 1924.

Third. That more than six months elapsed between the drawings of juries during each year from August 7, 1922, to February 21, 1927.

Fourth. That F. F. Meadows, clerk of court, participated as a member of the jury commission at all of its sessions, but never qualified as a member thereof by taking the prescribed oath as such.

[3] The first and second grounds of defendant's motion are interrelated, in the sense that one is dependent upon the other. Defendant relies upon section 3 of Act 135 of 1898 and the following cases: State v. Bain, 135 La. 776, 66 So. 196; State v. Scott, 110 La. 369, 34 So. 479; State v. Newhouse, 29 La. Ann. 825; State v. Lewis, 135 La. 781, 66 So. 199; State v. Arata, 32 La. Ann. 193; State v. West, 33 La. Ann. 1261; State v. Beaird, 34 La. Ann. 104; State v. Nockum, 41 La. Ann. 689, 6 So. 729; State v. Riley, 41 La. Ann. 693, 6 So. 730; State v. Hall, 44 La. Ann. 976, 11 So. 574; State v. Taylor, 44 La. Ann. 783, 11 So. 132. It is useless to review the cited cases; for this court, in later decisions, has held that, where a jury commissioner, appointed under the provisions of section 3 of Act 135 of 1898, has qualified by taking the oath prescribed by law, and is in actual possession of the office under color of right, he is a jury commissioner de facto if not de jure, and the title to his office and his acts as such officer cannot be inquired into collaterally. State v. White, 153 La. 300, 95 So. 776; State v. Smith, 153 La. 577, 96 So. 127; State v. Mitchell, 153 La. 585, 96

So. 130; State v. Moreau, 153 La. 671, 96 So. 527; State v. White, 156 La. 770, 101 So. 136; Williams v. Police Jury, 160 La. 325, 107 So. 126.

[4] The third ground of defendant's motion would have been tenable under the rigid provisions of section 6·of Act 135 of 1898, but the rigid provisions of that act were repealed by Act 23 of 1908, and the pertinent section of the later act is as follows:·

"Section 1. Be it enacted by the General Assembly of the state of Louisiana, that the judges of the district courts, the parish of Orleans excepted, are hereby authorized and directed to fix the times at which grand juries shall be impaneled in the parishes composing their respective districts, provided that pursuant to article 117 of the Constitution there shall be impaneled a grand jury in each parish twice in each year to remain in office until a succeeding grand jury is impaneled; and provided further that no grand jury shall be impaneled for more than eight months, nor less than four months; except in the parish of Cameron, in which at least one grand jury shall be impaneled in each year."

In this case the court's orders for the drawing of grand juries were entered at intervals of about six months, and the juries were drawn a few days thereafter. In no instance was a grand jury drawn for less than six months, and in every instance their successors were impaneled within a few days after they had served six months.

[5] The fourth ground of defendant's motion attacks the capacity of the clerk of court to serve as a jury commissioner before taking the prescribed oath as such. This ground is disposed of by the cases of State v. Starr, 52 La. Ann. 610, 26 So. 998, and State v. Bradley, 120 La. 248, 45 So. 120, which holds that the clerk of court is ex officio a jury commissioner and is not required to take a special oath as such.

[6] Bill No. 3 was reserved to the overruling of a motion to quash the venire of petit jurors. The grounds for this motion are the same as those we have just passed upon in our consideration of bill No. 2, except that the names of two petit jurors, C. H. Acklen and M. E. Foust, appear on the venire list as C. H. Acklin and M. E. Faust. The erroneous substitution of an improper letter in the spelling of a proper name that does not change the sound thereof is merely idem sonans. In the case of State v. Restiva, 149 La. 683, 90 So. 23, this court said:

"The word 'malice,' in an indictment for murder, is equivalent to the word 'malace,' under the rule of idem sonans, and absolute accuracy in spelling is not required in legal documents or proceedings, if the name as spelled sounds the same to the ear."

[7] Bill No. 4 was reserved to the overruling of a challenge for cause of juror M. B. Kilgore. We need not review the answers of this juror to the questions propounded to him on his voir dire, for the juror was peremptorily challenged, and the minute entry (page 8 of the transcript) shows that, when the jury was completed, defendant had not exhausted the peremptory challenges he was legally entitled to, and therefore, if we thought the court erred, the bill is without merit, for the defendant could not have been prejudiced by the ruling. State v. Sweeney, 135 La. 566, 65 So. 743.

[8-10] Bill No. 5 was reserved to a ruling of the court sustaining a challenge for cause of juror Prentiss J. Tanner. In the impaneling of a petit jury, the defendant's right is one of rejection rather than of selection. He may exclude from the panel, for cause, a biased, prejudiced, or incompetent juror; and, in cases such as this, he may peremptorily challenge twelve jurors. The rejection of a juror, whose competency is questioned, cannot prejudice the defendant, and, if the judge errs in sustaining the challenge of such juror, for cause, the error is merely one of judgment in the exercise of judicial discretion, and is harmless in its consequences. The books are full of cases holding that a

defendant will not be heard to complain of a ruling of the trial judge which does not affect him injuriously. State v. Sweeney, 135 La. 566, 65 So. 743; State v. Kennon, 45 La. Ann. 1192, 14 So. 187; State v. Mansfield, 52 La. Ann. 1355, 27 So. 887; State v. Miller, 125 La. 254, 51 So. 189; State v. Britton, 131 La. 877, 60 So. 379.

[11] Bill No. 6 was reserved to the overruling of defendant's objection to Dr. E. B. Middleton, the coroner and a state witness, answering, in response to the district attorney's inquiry, the following question:

"I will ask you if Mr. Foster didn't say among other things, at the time he made his statement, that, when Stephenson reached for his pistol, he drew it half out? (The Foster and the Stephenson referred to being the accused and the deceased.)"

The question was objected to as being an attempt to contradict the written report or procès verbal of the coroner. The judge's per curiam disposes of this bill, and there is nothing in the record which questions the accuracy of the per curiam, which is as follows:

"This witness was the coroner, and the question, taken in connection with other questions to and answers by this witness, was permissible. No inquest was held, and therefore no procès verbal showing the report of a coroner's jury. The question referred to certain statements made by the defendant to the coroner in the town of Homer. The answer to this question showed a statement by the accused to this witness to be the same as made by him to at least two other witnesses whose testimony was not objected to. This witness was examined on the preliminary trial, and testified, at that time, to the entire statement of Foster, and counsel was calling for the whole statement."

[12] Bill No. 7 was reserved to the overruling of defendant's objection to witness Claude Lowery answering the following question:

"Did you see Mr. Foster when he left up there at the house?"

The question was objected to as being leading. The objection seems frivolous. It did not suggest the answer desired, and was therefore not amenable to the objection urged.

[13] Bill No. 8 was reserved to the overruling of an objection to witness Claude Lowery answering the following question:

"Just state what took place between you and him there."

The question was objected to for the reason "that anything other than what was gone into by the defendant would be irrelevant and hearsay." The per curiam of the judge disposes of this bill. The judge says:

"This was a redirect examination on matters gone into by defendant on cross-examination," etc.

[14] Bill No. 9 was reserved to the overruling of an objection to witness Pat Bishop answering this question:

"Mr. Bishop, how long had Guinn Stephenson's father lived in that community?"

The answer was objected to as being irrelevant.

[15] Bill No. 10 was reserved to the overruling of defendant's objection to witness Bishop answering this question:

"Neighbors are pretty far apart, are they not?"

The question was objected to as being leading, suggestive, and irrelevant.

[16] Bill No. 11 was reserved to the overruling of defendant's objection to witness Bishop answering this question:

"How many children did he (Mr. Stephenson, father of the deceased) have by his second wife?"

From the record it appears that defendant attempted to show Guinn Stephenson occupied his father's farm without authority. The testimony referred to in bills 9 and 11 was the beginning of proof in rebuttal of that contention, and was admissible for that purpose. The testimony referred to in bill No. 10 was

admissible for the purpose of showing the circumstances surrounding the killing. The judge in his per curiam says:

"The killing occurred in the country on the farm of the father of the deceased, in the road that ran between where the residence had burned and where the barn burned a few weeks later. There were no eyewitnesses to the killing. The general surroundings in that vicinity, taken into consideration with certain facts of this case, were pertinent as shedding whatever light they might on the facts and manner of the killing."

[17] Bill No. 12 was reserved to the sustaining of an objection by the state to certain questions propounded to witness Bishop, on cross-examination by counsel for defendant. The defendant sought by a series of questions to have the witness testify to what the father of the deceased had sworn to on a former occasion relative to the unruly character of the deceased when he was a boy. The testimony was excluded as being hearsay. We think the ruling is correct. The judge says:

"This was clearly hearsay of the rankest kind. The questions refer to what the father of the deceased swore to at a preliminary trial of defendant. The father was summoned as a witness in this case by the defendant and could have been called as a witness."

We will add that, if the father had testified, and his testimony differed from that given by him on the former occasion, it would have been proper, and the judge would doubtless have admitted the proffered testimony for the purpose of impeachment.

[18] Bill No. 13 was reserved to the overruling of defendant's objection to witness Joe Odom answering this question:

"What did you mean when you told him that he was a dangerous man?"

The answer was objected to as being hearsay, and something not expressed to the defendant. The witness had testified on cross-examination, by counsel for defendant, that he had told the defendant prior to the homicide that the deceased was a dangerous man.

The per curiam of the judge disposes of the bill as follows:

"The counsel for defendant asked the witness certain questions about what he told defendant about the deceased being a dangerous man. The questions were asked in such a way as to elicit answers which were not full and complete, and the state, as well as the witness, was entitled to a full explanation of the entire statement made to Foster, and, under the circumstances, it was pertinent. The question above copied was not answered, but another was asked, and the court held that the witness might explain the expression he used. The witness then stated just what was said about the matter."

From the per curiam, it appears that the question objected to was not answered.

[19] Bill No. 14 was reserved to the overruling of defendant's objection to the following question propounded to witness Odom:

"What did you mean by a dangerous man? What is the idea now that was in your mind when you made that statement."

This is apparently the question referred to in the per curiam to bill No. 13 as the second question asked the witness. It was objected to on the ground that it was an idea in the mind of the witness which was not expressed to the defendant. The court's ruling was in the following words:

"He may explain the expression that he used."

And the court's per curiam to this bill is as follows:

"The clerk's note of evidence shows just what questions were asked. In answer to the question asked, the witness simply restated what was said by him to Foster and what Foster said to him, without giving his own opinion or conclusions, and, as the court understood, the purpose of the question was to elicit the entire conversation, part only, of which had been stated in answer to questions on cross-examination."

The court merely ruled that the witness might explain his testimony. This ruling was eminently proper. The witness had the right to demand that he be accorded that privilege.

[20] Bill No. 15 was reserved to the over-

ruling of a motion to strike from the record all that portion of Mrs. Myrtle Foster's testimony relative to what the accused might have said or told her in private conversations with her, as being privileged communications, which were admitted in evidence in violation of section 1 of Act 157 of 1916, and asking that the jury be instructed to disregard the same. When Mrs. Foster was sworn as a witness for the state, she was informed by the court that she could not be compelled to testify, and that, if she did testify, it would be her sole and voluntary act. She voluntarily submitted herself as a witness, and was sworn and testified without objection on the part of defendant. Thereafter what transpired is accurately stated in the per curiam to this bill, which follows:

"Counsel for the defendant made no objection to any testimony of Mrs. Myrtle Foster on Tuesday, April 12th, except to object to one question as leading and assuming a fact not proved. The question was not amenable to this objection.

"After the direct examination closed, the counsel for defendant cross-examined the witness on all the matters gone into by the state, about private conversations with Foster, written statements of that character, thereby waiving the question of privileged communications or private conversations, and even went into these at length himself, on cross-examination of this witness on the afternoon of April 12th.

"The next day, on April 13th, after resuming the cross-examination of the witness, counsel filed his motion to strike the evidence out and to have the jury instructed to disregard it. The court knew of no law authorizing such a proceeding, and felt that, as this testimony had already gone to the jury, it would have been humanly impossible for the jury to have disregarded it in making up their verdict. A defendant cannot wait to see whether or not testimony would be adverse or favorable to him, and, should such testimony prove adverse, then object and ask that it be stricken from the record and the jury instructed to disregard it. Had the defendant objected to the testimony at the time, before it went to the jury, the court would have sustained the objection to all of her testimony as to private and privileged conversations and would have admitted only such as was admissible. In the beginning of this case Mrs. Foster was favorable to the defendant; later, finding that defendant had a living wife from whom he was not divorced, and that she was a bigamous wife, and their marriage a nullity, she became hostile to him. He possibly did not know the extent of the hostility, and felt that by cross-examination he could elicit favorable testimony, and did not object to her testimony."

Counsel for defendant contend that, notwithstanding their failure to timely object to the testimony, the admission in evidence of private conversations between Mrs. Foster and her husband violated a prohibitory law, viz. section 1 of Act 157 of 1916. The part of section 1 of the Act relied upon is as follows:

"Be it enacted by the General Assembly of the state of Louisiana, that the competent witness in any proceeding, civil or criminal, in court, or before a person having authority to receive evidence, shall be a person of proper understanding, but: First. Private conversations between husband and wife shall be privileged. Second. Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other," etc.

[21] It is the accepted rule that, upon considerations of public policy, communications made by one spouse to the other in the confidence of the marital relation are protected from disclosure. The law of this state does not prohibit the disclosure of such communication, but it merely confers upon certain persons the privilege of exercising his or her right to exclude or admit them in evidence. The prohibition arises only when the person in whose favor the privilege exists demands, by timely objection to the testimony, that the privilege be enforced. This doctrine is concisely stated in 40 Cyc. p. 2352, as follows:

"Where persons occupy towards each other certain confidential relations, the law will not compel or even allow one of them to violate the confidence reposed in him by the other, by testifying, *without the consent of the other*, as to communications made to him by such other in the confidence which the relation has inspired," etc. (Underscoring ours.)

[22, 23] It is needless to cite more authorities to the effect that, where the law creates a privilege, the person in whose favor the privilege exists may waive it. In addition, this court has repeatedly held that an objection to the admissibility of testimony comes too late after the testimony has gone to the jury. State v. Rollin, 136 La. 78, 66 So. 545. The rule is the same when, as in this bill, it is sought to exclude testimony that went to the jury without objection. In the case of State v. Rohfrischt, 12 La. Ann. 382, the syllabus, which is an accurate synopsis of the text of the opinion, reads:

"Where testimony had been given without objection, as shown by the bill of exceptions, and its exclusion had, therefore, become impossible, the jury being already in possession of it, held: That a motion to exclude such testimony was unmeaning and was properly overruled."

The case of State v. Munston, 35 La. Ann. 889, is to the same effect.

[24] Bill No. 16 was reserved to the sustaining of an objection by the district attorney to a certain question asked Mrs. Foster, while on cross-examination, by counsel for defendant. After the ruling, the question was repeated, it was not objected to, and the witness answered it; hence there can be no complaint. The record does not definitely disclose whether the question was for the purpose of impeachment, or for other purposes. The judge was of the opinion that it was for impeachment. The per curiam is as follows:

"The proper basis had not been laid for this question. The time, place, or circumstances had not been called to the attention of the witness. Later the question was renewed, was not objected to, and was answered by the witness."

[25] Bill No. 17 was reserved to the overruling of defendant's objection to the following question propounded by the state to Mrs. Foster:

"Mrs. Foster, did you ever make any such statement as written there to any person at any time?"

164 LA.—27

The question was objected to as being irrelevant, hearsay, and not binding on the defendant. Under the circumstances disclosed by the record, we are of the opinion that the question was pertinent, and that the testimony sought to be elicited was not hearsay. We are also of the opinion that the judge's per curiam disposes of the bill. This is the per curiam:

"It was shown on cross-examination that this witness was favorable to defendant for some time after the killing, and that for some reason she wrote up a lot of stuff, of incidents occurring, and what she had heard various parties say about the deceased, in a tablet. She learned of the first wife of defendant, that she was living and undivorced, and turned against him, and got hold of the tablet in which she had done the writing. Counsel called for it, and it was turned over to him, and he sought to make her say that she had made certain statements to her husband written in the tablet and to make it appear to the jury that she had made the statements in the tablet as facts. On redirect examination, to correct the impression sought to be created in the minds of the jurors by the manner of the cross-examination, the above question was properly asked, and the court overruled the objection, feeling that the state should correct such erroneous impressions and show all the facts concerning the statements in the tablet."

[26] Bill No. 18 was reserved to the overruling of defendant's objection to the following question propounded to Mrs. Foster:

"What was he (the deceased) doing when you saw him?"

The question was objected to as being irrelevant, because witness saw the deceased between 8 or 9 o'clock and the killing did not occur until 5 o'clock that afternoon. The testimony given by the witness was that between 8 or 9 o'clock in the morning she saw the deceased carrying turnip greens to her house. As the witness and defendant were living together in the same house as man and wife, the judge ruled that the testimony was relevant for the purpose of showing malice.

In the case of State v. Deschamps, 42 La.

Ann. 567, 7 So. 703, 21 Am. St. Rep. 392, it is held that:

"Since malice cannot usually be directly proved, and the evidence of it, therefore, being circumstantial, any facts which go to afford an inference of its existence are admissible."

[27] Bill No. 19 was reserved to the overruling of defendant's objection to the following question, which was addressed to witness Foster Bailey:

"I will ask you if a short time before the killing you heard Mr. Foster make any threats against Guinn Stephenson? Just state to the jury and the court what he said."

The question was objected to for the reason that the time and place had not been laid. The testimony was admitted solely for the purpose of showing malice. It was admissible for that purpose.

[28] Bill No. 20 was reserved to a ruling of the court refusing defendant the right to interrogate witness E. E. Spears relative to the character of the deceased for peace and quiet. The ruling was based upon the ground that no foundation had been laid for the admission of the proposed testimony. Thereafter the proper foundation was laid, and the testimony was admitted and went to the jury; therefore there is no merit in the bill.

[29] Bill No. 21 was reserved to the overruling of defendant's objection to the following question, propounded to the defendant while on cross-examination:

"What seemed to have been the starting of the trouble between you and Stephenson?"

The objection is that the question relates to a matter not gone into by defendant on direct examination, and is not an attack upon the credibility of the witness. The court's per curiam is as follows:

"There were no eyewitnesses to the homicide, and the statement of defendant was opposed by many physical facts in the case, and, as there had been no previous trouble between defendant and deceased, the state sought to elicit, if possible, whether or not there was previous trouble and when same began. All statements made by the defendant were of a self-serving character, and the state clearly had the right to show that these statements were untrue, even by the words of the defendant himself."

From the per curiam it appears that, while the particular matter upon which the witness was questioned was not directly referred to in the examination of the witness in chief, nevertheless the testimony the district attorney sought to elicit was really in rebuttal of testimony given by him in chief, and it was certainly admissible for that purpose.

[30] Bill No. 22 was reserved to the overruling of defendant's objection to this question addressed to the defendant on cross-examination:

"There is a charge of bigamy against you here in this court, is there not?"

The objection is that the matter inquired about is irrelevant, and that it does not create a presumption of guilt or test the witness' credibility. The judge in his per curiam says that the witness had said that he did not know of the existence of such a charge, and the question was permitted to test his credibility.

[31] Bill No. 23 was reserved to the overruling of defendant's objection to the following question propounded to witness Ed Shackleford:

"Did you know his (the deceased's) reputation in the community in which you and he resided for peace and quietude?"

The objection was that the proper basis for the admission of the testimony had not been laid. The trial judge says:

"This testimony went before the jury unrestricted on further examination of this witness and of several other witnesses."

As a matter of fact, the question objected to was not objectionable. It merely called for a "Yes" or "No" answer as to whether the witness knew the reputation of the deceased for peace and quiet in the community in which he lived. The subsequent questions

and answers in which the reputation of the deceased was testified to went to the jury without objection.

[32] Bill No. 24 was reserved to the exclusion from the evidence of a document offered by the defendant as a part of the procès verbal of the coroner.

It was objected to as being hearsay, not in legal form, and because the coroner had been a witness, had testified fully, and was present in court to testify. The pertinent part of the per curiam to this bill is as follows:

"This instrument is not and does not purport to be a procès verbal of any inquest held by the coroner. In fact no inquest was held. The writing in question was a mere statement by the coroner as to the cause of the death of the deceased, and a statement by the defendant, not under oath, as to the cause of the killing," etc.

The document was offered for the restricted purpose of showing that the testimony of the coroner as to the statement made to him by the defendant differed from the defendant's statement as it appeared in the written document. The coroner testified to the correctness of the written document, but stated that it did not contain all that the defendant said at the time. His testimony merely supplemented what the defendant had said in connection with the statement as written. We see no error in the ruling.

[33] Bill No. 25 was reserved to the overruling of defendant's objection to the following question propounded to Mrs. Foster:

"Mrs. Foster, do you remember what Mr. Foster did and where he was on Saturday morning before the killing took place next Tuesday?"

The question was objected to as coming under the rule governing privileged communications. The testimony called for has no relation to a private communication between the defendant and his wife; the wife had been informed of her right to refuse to testify; she had voluntarily waived that right, and was therefore competent to testify to the

fact sought to be elicited. There is no error in the ruling.

[34] Bill No. 26 was reserved to the same ruling complained of in bill No. 25, but upon the ground that the matter inquired about had been gone into on the direct and cross examination of the witness, and that the state cannot be heard to impeach its own witness. There is nothing in the record to indicate that the state sought to impeach the witness. The judge says that the testimony was admitted for the reason that:

"The defendant had testified that he met deceased in the road at his house on this Saturday morning between 9 and 10 o'clock, and deceased made certain threats that he was going to kill him (defendant). The purpose of this testimony was to show that Foster was not at home during the forenoon at all, to rebut this statement relative to such conversation."

The testimony was pertinent and admissible for the purpose for which it was offered.

[35] Bill No. 27 was reserved to the district attorney asking the witness Mrs. Foster the following question:

"At whose direction did you write that statement?"

The statement referred to appears on the tablet mentioned in our consideration of bill No. 17. The question was objected to as being prejudicial error, designed to insinuate that defendant had directed his wife to write the statement. The objection was sustained. No request was made of the judge to instruct the jury regarding the matter, and we therefore know of no good reason why this bill was presented to the judge for his signature.

[36] Bill No. 28 was reserved to the overruling of defendant's objection to the following question propounded to witness Pierce Bailey:

"About what time did he leave your house in the morning—Saturday morning?"

The question was objected to as not being in rebuttal of any evidence offered by the defendant. The judge says:

"This question was in rebuttal of defendant's contention that deceased spent Friday night in Haynesville, and that he was at Foster's house and made threats to kill him on Saturday morning between 9 and 10 o'clock."

Bill No. 29 is reserved for the same reason as bill No. 28, and the bills are identical except as to the particular question asked the witness, and the judge gives the same reasons for his ruling.

[37] Bill No. 30 was reserved to the overruling of defendant's objection to witness Odom testifying in the case. All witnesses had been placed under the rule and excluded from the courtroom. After the defendant had closed his testimony, Mr. Odom, who does not appear to have been summoned as a witness, but who had been in the court during the trial, had heard a good part of the case, but had not been put under the rule or instructed by the court, was called by the state in rebuttal, as a character witness. The court ruled that the right to call the witness, under the circumstances stated, was a matter within its discretion, and it permitted the witness to be sworn and give his testimony. This was clearly a matter within the discretion of the court, and it is a well-recognized rule that courts of justice, acting within their discretionary powers, will not be interfered with unless it be shown that their discretion was abused or exercised in an arbitrary or capricious manner.

Bill No. 31 was reserved to the overruling of a motion for a new trial. The motion is based upon the grounds set forth in the bills of exception which we have passed upon.

[38] Bill No. 32 was reserved to the overruling of a motion in arrest of judgment. No defect is patent on the face of the record. The motion recites that the verdict of the jury was based upon the testimony of the wife of the accused relative to private communications between them. We disposed of this contention in our consideration of bill No. 15, wherein we found that defendant waived his privilege when he should have objected, and therefore the court properly declined to instruct the jury to disregard it. This finding also disposes of defendant's allegation that he was convicted without due process of law, in violation of the Fourteenth Amendment of the federal Constitution and of section 2 of article 1 of the Constitution of this state. Whether defendant's attack, in the alternative, of Act No. 157 of 1916 be sound or otherwise need not be inquired into, for the reason that, without the act, there is abundant authority for holding that a defendant's right to exclude a privileged communication may be waived. We think the judge correctly overruled the motion.

[39] After the case had been disposed of and the defendant had been granted an appeal, defendant filed a motion to have the court correct its per curiams to bills of exception Nos. 15 and 17 with respect to the court's statement in its said per curiams that Mrs. Foster was the bigamous wife of the accused. The court overruled the motion, and it does not appear that a bill of exceptions to this ruling was prepared and tendered to the judge for signature. In the absence of such a bill, the matter cannot be considered. State v. Read, 52 La. Ann. 271, 26 So. 826; State v. Evans, 135 La. 891, 66 So. 259. We will say, however, that this matter was not considered by us in reaching the conclusions we have announced. We have rested our judgment on this point, upon the ground that the defendant could and did waive his privilege relative to the confidential communications testified to by his wife. We find no reversible error in the record, and the verdict, judgment, and sentence are affirmed.