STATE of Iowa, Appellee,

v.

Terry HARRINGTON, Appellant.

No. 62543.

Supreme Court of Iowa.

Oct. 17, 1979.

Paul E. Watts, Omaha, Neb., and Noran L. Davis, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., and Lona J. Hansen, Asst. Atty. Gen., for appellee.

Considered by REES, P. J., and HARRIS, McCORMICK, ALLBEE and McGIVERIN, JJ.

McGIVERIN, Justice.

Defendant Terry Harrington appeals from his conviction and sentence for first-degree murder under sections 690.1–.2, The Code 1977. In seeking a reversal and new trial, defendant raises five issues involving trial court rulings. We affirm.

Defendant's jury trial conviction arose from the July 22, 1977, killing of John L. Schweer, a nighttime security guard for several Council Bluffs auto dealerships.

We considered a companion case involving this incident in *State v. McGhee*, 280 N.W.2d 436 (Iowa 1979).

Harrington raises the following issues for our review of adverse trial court rulings:

1. Whether evidence relative to his seized jacket should have been suppressed;

2. Whether his motion for directed verdict should have been sustained because of insufficient evidence of premeditation and deliberation, essential elements of first-degree murder under section 690.2;

3. Whether his motion for directed verdict should have been sustained because of insufficient evidence to corroborate the testimony of an alleged accomplice;

4. Whether the jury was adequately instructed regarding consideration of prior inconsistent statements of witnesses; and

5. Whether alleged prosecutorial misconduct deprived defendant of due process and a fair trial.

The principal witness for the State was Kevin Hughes.

From the evidence, the jury could have found the following facts. After midnight on July 22, 1977, defendant, Curtis McGhee and Hughes, all juveniles, met at a parking lot in Omaha, Nebraska. The three drove to Council Bluffs, planning to steal a car. They parked near the McIntyre Oldsmobile-Cadillac lot. McIntyre's was one of the businesses employing John Schweer as a security guard.

Defendant got a shotgun from his auto trunk and wrapped it in his jacket. Har-

rington and McGhee went into the car lot in furtherance of the plan while Hughes stayed at defendant's auto.

Three or four minutes later, Hughes heard a shot. Defendant and McGhee ran back to the car with defendant carrying the shotgun and jacket. Hughes asked what happened and defendant responded that he had "shot a cop." Hughes verified this statement with McGhee. Defendant put the shotgun in the car and the three drove back to Omaha.

On return to Omaha at about 1:30 a. m., Hughes went to the house of Linda Lee, his girlfriend, where he went inside for five or ten minutes. Next defendant and McGhee took Hughes to the original parking lot from which Hughes phoned Candace Pride.

On the morning of July 22 John Schweer was found dead from shotgun wounds along some railroad tracks near the car dealerships that employed him.

After a petition alleging delinquency by defendant in connection with the murder was filed in juvenile court under Chapter 232, The Code 1977, the court, after application and hearing under section 232.72, transferred the case to the Pottawattamie County Attorney for proper action under the criminal law.

The county attorney then charged defendant by information with the first-degree murder of Schweer.

Other facts will be stated later as necessary for understanding of the issues raised for review.

I. *The seized jacket.* In a pretrial motion, defendant sought to suppress evidence relative to a jacket he was wearing when arrested on the evening of September 30. The jacket matched the description of the one Hughes said the murder weapon was wrapped in, except for a slight variation in color. At approximately 8:30 a. m. on October 1 while defendant was in police custody, officer Putnam requested the jacket from defendant, who gave it to him. No search warrant was obtained for the taking.

Chemical examination disclosed the jacket contained two flakes of gunpowder of the type used in shotguns.

The court overruled defendant's motion to suppress, relying on the "plain view" exception to the requirement for a search warrant before seizing a person's property by police authorities. *See State v. Davis,* 228 N.W.2d 67, 71 (Iowa 1975).

The jacket and particles of gunpowder found on it were admitted in evidence at trial. In contesting the ruling, defendant claims his rights under the fourth and fourteenth amendments to the United States Constitution against unreasonable searches and seizures were violated; therefore the evidence is inadmissible at trial. *State v. Rees,* 258 Iowa 813, 824, 139 N.W.2d 406, 413 (1966).

■ When reviewing a trial court order overruling a motion to suppress based on a claimed violation of constitutional rights, we make an independent evaluation of the totality of the circumstances. *State v. Iowa District Court In and For Johnson County,* 247 N.W.2d 241, 245 (Iowa 1976).

The general rule that warrantless searches and seizures are unreasonable under the fourth amendment to the United States Constitution is subject to various exceptions. One of these exceptions, asserted here by the State, permits a warrantless search and seizure incident to arrest. *United States v. Edwards,* 415 U.S. 800, 802, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771, 775 (1974); *State v. Kramer,* 231 N.W.2d 874, 878 (Iowa 1975); *State v. Raymond,* 258 Iowa 1339, 1348, 142 N.W.2d 444, 449 (1966).

Under the rationale of *Edwards,* the clothes worn by a defendant at the time of his arrest may be taken, examined, and preserved for use as evidence without a warrant the day after his arrest, when defendant is still in the lawful custody of the police. As the Court said in *Edwards,* "[I]t is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." 415 U.S. at 806, 94 S.Ct. at 1238, 39 L.Ed.2d

at 777. We said in *State v. Kramer*: "[T]he warrantless seizure of defendant's jacket within two or three hours following his arrest and while he continued in custody did not violate his constitutional rights. This situation falls within the 'search incident to an arrest' exception to the general requirement of a search warrant." 231 N.W.2d at 878.

■ We hold that where the police have probable cause to believe that a jacket worn by defendant at the time of his arrest is evidence of a crime committed by him, it is not unreasonable under the fourth amendment to take, examine and hold as evidence that jacket the morning after his arrest when the officers familiar with the crime first interrogate him.

We, therefore, find it unnecessary to consider whether defendant's jacket was properly seized under the "plain view" exception to the search warrant requirement.

The trial court did not err in overruling defendant's motion to suppress.

*II. Sufficiency of premeditation and deliberation evidence.* Harrington next contends the evidence bearing on the issue of his premeditation and deliberation was not sufficient to justify submission to the jury of the first-degree murder charge; therefore his motion for directed verdict as to first-degree murder should have been sustained.

Section 690.2 provides in pertinent part, that all murder (killing any human being with malice aforethought)[1] that is a "willful, deliberate, and premeditated killing" is murder in the first degree.[2] *State v. Gilroy*, 199 N.W.2d 63, 66 (Iowa 1972).

The standard for review of the sufficiency of evidence to support a criminal conviction is set out in *State v. Overstreet*, 243 N.W.2d 880, 883–84 (Iowa 1976). "Al-

though the test repeated in *Overstreet* regarding adequacy of circumstantial evidence . . . has been supplanted by a revised standard, *see State v. O'Connell*, 275 N.W.2d 197, 204–05 (Iowa 1979), the remaining aspects of *Overstreet* still apply here." *State v. Hillsman*, 281 N.W.2d 114, 115 (Iowa 1979).

■ If there is sufficient evidence before the jury to support a first-degree murder conviction, an instruction on first degree should have been given. *See State v. Reese*, 259 N.W.2d 771, 778 (Iowa 1977).

We must apply the *Overstreet-O'Connell* test and determine if sufficient evidence of premeditation and deliberation by Harrington exists to support his conviction.

We have stated:

> To deliberate is to weigh in one's mind or to consider. To premeditate is to think or ponder upon a matter before action. Premeditation and deliberation may not be presumed. It may not be inferred from intent. However, premeditation and deliberation need not exist for any particular length of time.

*State v. Fryer*, 226 N.W.2d 36, 41 (Iowa 1975) (citation omitted).

"[T]he general rule is that one who arms himself with the express purpose of shooting another cannot ordinarily claim the elements of first degree murder are lacking. The use of a deadly weapon accompanied by an opportunity to deliberate is evidence of malice, deliberation, premeditation and intent to kill." *State v. Smith*, 240 N.W.2d 693, 695 (Iowa 1976); *Fryer*, 226 N.W.2d at 41.

■ When the State is required to rely upon circumstantial evidence of premeditation and deliberation, one or more of three categories of evidence are often used: (1)

---

1. Section 690.1 provides:
   Whoever kills any human being with malice aforethought, either express or implied, is guilty of murder.

2. Section 690.2 provides:
   All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary, is murder in the first degree and shall be punished by imprisonment for life at hard labor in the penitentiary and the court shall enter judgment and pass sentence accordingly.

evidence of planning activity of the defendant which was directed toward the killing; (2) evidence of motive which might be inferred from prior relationships between defendant and the victim; and (3) evidence regarding the nature of the killing. *See People v. Anderson*, 70 Cal.2d 15, 26–27, 73 Cal.Rptr. 550, 557, 447 P.2d 942, 949 (1968); W. LaFave and A. Scott, *Handbook on Criminal Law* § 73 at 564 (1972). Adequate evidence to support submission of the issue, and a subsequent conviction, might come entirely from one category, or from more than one. *Cf. Fryer*, 226 N.W.2d at 41 (showing of motive is not required).

■ The evidence here is sufficient to substantially support a finding of premeditation and deliberation by defendant.

Harrington and his companions drove from Omaha to Council Bluffs with the intent to steal a car. Upon arriving at the car lot, defendant armed himself with a shotgun. He set off on foot with McGhee to steal a car and inferentially to use the shotgun to do so. Hughes heard a shot. One unexploded shotgun shell was found in the car lot. The cause of Schweer's death was loss of blood from a shotgun wound in the right arm and chest. Pellets later taken from his body were consistent in size and oxidation with shot in the unexploded shell. Schweer's pistol was found near his body.

When defendant and McGhee came running back to Hughes, defendant stated he "shot a cop."

Taking the evidence in the light most favorable to the State and drawing all reasonable inferences in favor of the verdict, there was substantial evidence from the plan of defendant and the nature of the killing to justify submission to the jury of the issue of defendant's premeditation and deliberation.

No error exists here.

*III. Corroboration of the alleged accomplice.* Defendant contends his motion for directed verdict also should have been sustained because the State failed to established sufficient evidence to corroborate the testimony of the alleged accomplice, Kevin Hughes, under section 782.5, The Code 1977.[3]

The State argues that Hughes was not an accomplice to the murder and, even if he was, his testimony is sufficiently corroborated.

The Court allowed the jury to decide whether Hughes was an accomplice and defendant made no objection to that procedure.

We discussed the definition of an accomplice in *State v. Jennings*, 195 N.W.2d 351, 356–57 (Iowa 1972) and need not repeat it here.

Although we have serious doubts whether Hughes was an accomplice, it is not necessary for us to make such a determination. Assuming, without deciding, that Hughes was an accomplice, there was sufficient other evidence corroborating his testimony to justify submission of the case to the jury.

■ The sufficiency of corroboration evidence is a question of fact for the jury. *State v. Vesey*, 241 N.W.2d 888, 890 (Iowa 1976); *State v. Nepple*, 211 N.W.2d 330, 331–32 (Iowa 1973). The "corroborating evidence need not be strong. All that is [required] is that the [accomplice] be corroborated in some material fact, which tends to connect the defendant with the crime, and therefore supports the credibility of the [accomplice] testimony." *State v. Horn*, 282 N.W.2d 717, 731 (Iowa 1979); *State v. Cuevas*, 281 N.W.2d 627, 629 (Iowa 1979).

■ Sufficient evidence for jury consideration existed corroborating the testimony of Hughes tending to connect Harrington with the crime. Dr. Samuel Rosa, Pottawattamie County Medical Examiner, testified that the death of John Schweer was caused by pellets shot into his body. Dr. A. L. Sciortino testified that the victim died

---

**3.** Section 782.5 provides:

A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof.

from a gunshot of multiple projectiles through the right arm and chest.

Clyde Jacobs, Candace Pride, and Roderick Jones all testified they saw Hughes get into a car with defendant and McGhee at the parking lot in Omaha.

Candace Pride testified to receiving a phone call from Kevin Hughes in the early morning hours of July 22.

Linda Lee testified that Kevin Hughes was at her home on only one occasion after midnight in July of 1977. He stayed for about five or ten minutes and then left, stating he would be back. At that time she saw the defendant in his car with another person, waiting for Hughes. She further testified that Hughes returned later that night.

A microscopic examination of defendant's jacket revealed two particles of smokeless gunpowder consistent with the type of powder used in shotgun shells.

John Schweer's body was found lying partially across some railroad tracks near McIntyre's car lot, which had been entered by defendant and McGhee.

The jury could have found Hughes' testimony was adequately corroborated. Defendant's motion to direct was properly overruled as to the lack of corroboration contention.

*IV. Instructing on prior inconsistent statements.* The Court instructed the jury on the general credibility of witnesses as follows:

> You are the sole judges of the weight of the evidence, the credibility of the witnesses, and the conclusions to be drawn from the facts and circumstances proved. If the testimony or any part thereof is conflicting, you will reconcile it if you can, so that it may all have weight and effect, but if you cannot, you will then give credit to that testimony and to those witnesses that to you as fair-minded men and women seem most entitled thereto. In passing on the credibility of the witnesses and weighing their testimony, you may and should consider their appearance and conduct on the witness stand, their

age, intelligence, strength of memory, and means of knowledge of matters of which they speak, the remoteness of events about which they testify, their interest or lack of interest in the result of the trial, the motives, if any, actuating them as witnesses, their candor, fairness, bias or prejudice, the reasonableness and probability of their statements or the want thereof, whether their testimony is corroborated or contradicted by other witnesses or facts proven, and from all of these and all other facts and circumstances proven upon the trial, determine where to give credit and where to withhold the same, and give to the testimony of each witness the weight to which you believe it is fairly entitled.

The instruction was identical with the language of Uniform Jury Instructions No. 501.5 (1970), and No. 105 (1978).

Defendant had vigorously cross-examined several of the State's witnesses such as Hughes, Candace Pride and Linda Lee, who had made prior inconsistent statements.

■ Defendant requested that the instruction be changed to include a specific enumeration of "prior inconsistent statements by the various witnesses." The trial court rejected defendant's request, ruling that the instruction as a whole did incorporate consideration of such statements and that they need not be specifically set out. We agree.

We recently discussed Uniform Jury Instruction No. 105 in *State v. Langlet,* 283 N.W.2d 330, 337 (Iowa 1979) where the instruction was attacked as constituting an impermissible comment on the evidence. There we said the instruction "is general; it refers to no specific evidence or witness." *Id.* at 337.

In *State v. Milliken,* 204 N.W.2d 594 (Iowa 1973) we pointed out the problems caused when instructions emphasize specific evidence. We said: "The evil attendant upon [such] instructions . . . is that they tend to lead a jury to dissociate the evidence thus emphasized from all other evidence they are duty bound to consider.

The proper practice is to give a general instruction . . . applicable to all witnesses alike." *Id.* at 596.

We have said many times that "[a] trial court is not bound to any model or form in wording instructions, and a requested instruction may be properly refused if the points raised are otherwise substantially covered." *State v. Wright*, 274 N.W.2d 307, 313 (Iowa 1979).

We dealt with the precise issue now before us in *Upton v. Paxton*, 72 Iowa 295, 33 N.W. 773 (1887). Although a civil case, the holding of *Upton* is instructive in light of the fact that the civil instruction on credibility of witnesses is materially identical to its criminal counterpart. Uniform Jury Instructions No. 1.5 and 501.5 (1970) and No. 105 (1978). We said: "With this general direction before [the jury], they could hardly have failed to consider the fact in question [impeachment] in determining what weight should be given to the testimony of that particular witness, although their attention was not specifically called to it by the instruction of the court." 72 Iowa at 301, 33 N.W. at 776; *see State v. Wright*, 274 N.W.2d 307, 314 (Iowa 1979) (criminal case, citing *Upton v. Paxton* with approval).

We hold that the general credibility instruction given by the court properly covered the substance of defendant's request, which was correctly overruled.

*V. Prosecutorial misconduct.* Finally, defendant claims his motion for new trial should have been sustained because of misconduct by the prosecutor. He says he thereby was deprived of due process and a fair trial.

Defendant alleges that the prosecutor: intimidated Thea Scott, one of Harrington's alibi witnesses; failed to disclose that a State's witness, Linda Lee, was lying; and indicated to Kevin Hughes what testimony to give at trial.

Defendant first complains that it was misconduct for the prosecutor to allow defense witness Thea Scott to be subjected to a polygraph examination, at the conclusion of which she was told she had failed. Scott consented to the polygraph examination. She felt she could take the witness stand and tell the truth, regardless of her encounter with the prosecutor and police.

The court found that the treatment she received did not intimidate her to the extent she could not take the oath and testify according to her own best recollection.

Defendant next claims that Linda Lee, a witness for the State, was lying at trial, that the prosecutor had knowledge of this and that it was misconduct for the prosecutor, Joseph Hrvol, to suggest a lawyer who practiced in Nebraska to help Mary Lee's son on an unrelated matter.

Mary Lee, the mother of Linda Lee, during the post-trial hearing on this issue, testified that she felt her daughter lied on the witness stand, either at the McGhee trial or the Harrington trial. McGhee had been previously convicted of first-degree murder for his involvement in the same crime. Mary Lee had no personal knowledge of the facts to which Linda Lee testified and only felt that her daughter's testimony was inconsistent from one trial to the next, in relation to the time Kevin Hughes was supposed to have visited the Lee home in July of 1977. The prosecutor never asked Linda Lee to do anything but tell what she had seen.

Mary Lee said she felt Kevin Hughes lied about receiving $5,000 for testifying at the Harrington trial, but she had no knowledge of *any* lies he may have told during his testimony at trial.

Mary Lee asked Joseph Hrvol if he knew a good attorney that could help her son who was in a Nebraska jail. Mr. Hrvol suggested to her a Nebraska lawyer he personally knew.

The court found no misconduct on the part of the prosecutor in his dealings with Linda Lee and also found that the evidence as it related to Linda Lee's possible lying was at best second-hand.

Defendant finally contends that it was prosecutorial misconduct for Mr. Hrvol to take Kevin Hughes to the scene of the crime and to tell Hughes time was important and what the defense was.

Hughes had lied to the police about the facts of the murder several times before he was taken to the scene. Subsequent to the trip to McIntyre's dealership and his conversation with Mr. Hrvol, he decided to tell the truth.

The court found a complete lack of basis for a finding of misconduct on these grounds.

■ In order for defendant to be entitled to relief there must also be a showing of prejudice from the misconduct before the prosecutor's actions will result in a reversal. *State v. Hall*, 235 N.W.2d 702, 726 (Iowa 1975).

■ Trial courts have considerable discretion in ruling upon motions for new trial. Such rulings will not be overturned absent an abuse of discretion. *State v. McGhee*, 280 N.W.2d 436, 442 (Iowa 1979).

■ Even if misconduct could be found on the part of the prosecutor here, it cannot be said defendant was prejudiced in any way. Thea Scott stated there was no reason why she could not take the witness stand and tell the truth and she did testify at trial.

There is no evidence that Mr. Hrvol had any knowledge that Linda Lee was lying at the trial of Terry Harrington. The fact that the alleged lying by Linda Lee came to the court from a third party who had no personal knowledge of the facts raises questions as to the accuracy of the allegation. Linda Lee was subjected to cross-examination by the defendant, and any question as to inconsistency between her testimony in the McGhee trial and the Harrington trial was a matter of public record.

We also fail to see any basis for prejudice in relation to the prosecutor's dealings with Kevin Hughes. Each of the items on which defendant alleges misconduct were presented to the jury for its consideration in determining the credibility of Hughes' testimony.

Defendant's motion for new trial was properly overruled.

Because we find no reversible error in defendant's contentions, whether specifically discussed or not, the judgment of the trial court must be and is hereby affirmed.

AFFIRMED.