STATE of Iowa, Appellee,

v.

Robert Lee KERN, Appellant.

No. 64398.

Supreme Court of Iowa.

June 17, 1981.

Rehearing Denied July 9, 1981.

Leon F. Spies, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., and Edward W. Kemp, Cedar County Atty., for appellee.

Considered by UHLENHOPP, P. J., and HARRIS, McGIVERIN, LARSON, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal involves several legal problems which arose in the trial of a first-degree murder charge. *See also State v. Judy Kay Kern*, 307 N.W.2d 29 (Iowa 1981).

Viewing the evidence in the light most favorable to the guilty verdict, *State v. Robinson*, 288 N.W.2d 337, 340 (Iowa 1980), the jury could find the facts substantially as follows. Ady and Jeanne Jensen were spouses. Jeanne was a close friend of defendant Robert Lee Kern and his wife,

Judy Kay Kern. Defendant was an agent for an insurance firm owned by Phillip Brammer. Jeanne Jensen was having an affair with Brammer, and her marriage to Ady had deteriorated.

Jeanne desired to have Ady done away with, and so informed Judy Kay Kern. Judy told her that defendant knew a person in Illinois who would kill Ady for a fee.

Defendant, Judy, and Jeanne then conceived the idea of procuring a life insurance policy on Ady for $50,000, of defendant's having the Illinois individual, Andrew J. Oglevie, kill Ady, and of splitting the insurance.

Defendant made arrangements with Oglevie in accordance with the plan. He directed Jeanne to get the fee of $50, a picture of Ady, and a description of a truck Ady drove. Jeanne subsequently passed an envelope to the Kerns containing those three items. Later Jeanne, at defendant's request, brought the Kerns a cancelled check bearing Ady's signature. With defendant, Judy, and Jeanne present, Jeanne helped defendant fill out a life insurance application on Ady, signed by defendant and also bearing Ady's forged signature.

Defendant presented the application and a premium check, likewise bearing Ady's forged signature, at Brammer's office, and those instruments were then forwarded to the insurance company.

Defendant, Judy, and Jeanne discussed wiring Ady's truck so that it would explode. Oglevie came from Illinois to perform his contract. He, defendant, and Judy went to the Jensen home while Ady was at work. Jeanne had given defendant the keys to Ady's truck, and defendant and Oglevie went to the garage and wired the truck to explode. Later, however, Ady discovered the wiring of the truck, and the plot to blow him up failed.

Undaunted, Oglevie decided on a different approach. He was informed that Ady was to go from Iowa City to his parents' rural West Branch home on a Saturday morning. Oglevie, defendant, and Judy planned that Oglevie would go to that home and wait, and when Ady left for that place Judy would call there and let the telephone ring three times.

Defendant helped Oglevie cut lines to tie up Ady's parents, and drove him to West Branch late Friday night. Oglevie, carrying a shotgun and wearing a handkerchief mask and rubber gloves, broke into the parents' home. He tied up the parents, made a number of statements in their presence endeavoring by ruse to draw attention away from defendant, Judy, and Jeanne, and told the parents he would get a telephone signal when Ady left Iowa City.

On Saturday morning Ady left for his parents' home, and Jeanne so informed Judy. Judy then called the home of Ady's parents and gave the telephone signal. Ady arrived at the elder Jensens' place. Oglevie confronted Ady, bound him up, and killed him by shooting him in the front and back. Oglevie then stole $300 from the home and left in a car of the elder Mrs. Jensen.

After these events defendant and Judy wanted Oglevie to stay away from Iowa. Defendant paid the back storage bill on Oglevie's van which was stored in this state, and towed it to Illinois for Oglevie.

The life insurance company received notification of Ady's death but denied coverage. Investigators subsequently concluded that the application and premium check were forgeries. They also learned of Jeanne's affair with Brammer. Fearful that he might become involved in a homicide charge, Brammer began to tape-record his conversations and telephone calls with Jeanne and the Kerns, and turned the tapes over to the investigating officers. As time passed, Jeanne began to confide to Brammer the details of her involvement in Ady's death, and Brammer funneled that information also to the investigators.

Within a couple months, with Brammer's encouragement, Jeanne agreed to turn State's evidence against the Kerns and Oglevie. In return the State charged her with conspiracy to commit a forcible felony. She pleaded guilty and was sentenced to incarceration in the Women's Reformatory.

Defendant and Judy were charged with first-degree murder and were jointly tried. They did not elect to testify. A jury found them both guilty, and the court sentenced them to life imprisonment. They both appealed, and the present appeal involves the case of defendant Robert Lee Kern. At the time of this trial Oglevie had not been tried.

I. *Hearsay objection to testimony of Olga Jensen, Lebre, Gearhart, and Dooley.* Defendant first contends that the trial court prejudicially erred in overruling his hearsay objection to the testimony of four witnesses.

A. The State claimed that the murder was the result of a conspiracy among the several individuals, and to prove its claim relied on Jeanne's testimony and circumstantial evidence. Evidence of the latter kind can be cogent, *Wroblewski v. Linn-Jones FS Services, Inc.,* 195 N.W.2d 709, 712 (Iowa 1972), and in this case it was particularly damning.

The rule regarding admissibility of conspirators' statements is stated thus in *State v. Kidd,* 239 N.W.2d 860, 864 (Iowa 1976) (citations omitted):

> [W]hen there is substantial evidence of a conspiracy, whether the offense charged is conspiracy or not, everything said by any conspirator in furtherance of the common purpose is deemed to have been said in behalf of all parties to the conspiracy. A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is thus admissible against the party as an admission.

Two conditions must be met for this rule to be applicable. First, the statement must have been made during the pendency of the conspiracy. Second, it must have been in promotion of the object or design of the conspiracy.

Also:

> Once a conspiracy has been shown, the burden is upon the conspirator to show it has ended. A conspiracy to commit robbery does not necessarily end when the robbery has been committed; it may persist at least until the fruits of the crime have been divided. A conspiracy may also continue into a concealment phase.

Olga Jensen, Ady's mother, testified to statements by Oglevie, one of the conspirators, when she was bound and he was waiting for Ady's arrival. These had to do with his waiting for the ringing of the telephone, events at a garage, and other incidents involved in the conspiracy. Linda Lebre, Oglevie's girl friend, and her sister Judith Gearhart, testified to statements by Oglevie about contemporaneous events in the course of Oglevie's carrying out the abortive plan to blow up Ady's truck.

Much of the testimony of Olga Jensen about Oglevie's statements is not hearsay at all. Hearsay is an extrajudicial statement offered to prove the truth of the assertion. *State v. Miller,* 204 N.W.2d 834, 840 (Iowa 1973). Most of Oglevie's statements to Olga Jensen were in the act of the execution of the conspiracy. They were not used to prove the truth of what was said—indeed, the State claims some of them were untrue—but merely to show the actual execution of the conspiracy and performance of the murder contract. Other statements in Olga Jensen's presence appear to have been made for the purpose of concealing the conspirators' real motive and drawing attention away from the coconspirators. The issue is similar as to some of the statements to Lebre and Gearhart. *See State v. Jones,* 271 N.W.2d 761, 767 (Iowa 1978); *State v. Wycoff,* 255 N.W.2d 116, 118 (Iowa 1977).

The rest of the statements to Olga Jensen, Lebre, and Gearhart are, however, hearsay. But the existence of a conspiracy had been established, and these hearsay statements would be admissible if made when the conspiracy was subsisting, as they were, and if made in furtherance of the conspiracy. They appear to have been made to "aid or assist" the conspiracy. *Kidd,* 239 N.W.2d at 865. The statements in Lebre's presence likewise appear to be connected with "promotion of the common design," *id.,* and Gearhart's testimony is of similar nature. This testimony meets the test, and defendant's objection to the testimony of these three witnesses lacks merit.

■ B. One of the side issues in the case, claimed by the State to be a red herring, was whether Ady, the victim, had been "running around" with Oglevie's wife. The State desired to refute the claim, in any event, but Ady was of course dead. A state agent, Dooley, interviewed a number of people who had been Ady's associates, trying to discover whether Ady in fact had any extramarital relationships. He found none.

Called to the stand, the agent was asked, after the necessary foundation was laid, whether he had found any evidence at all that Ady had engaged in any extramarital relationships. Over defendant's objection, the trial court permitted the agent to respond, and he answered that he had not learned anything of the sort. Defendant claims the court erred in permitting this testimony.

A plausible argument can be made that negative testimony of this nature indirectly introduces the out-of-court hearsay statements of the individuals questioned by the agent. A sounder analysis of the admissibility of such testimony, however, was made by the court in *Thomas v. State*, 54 Okl.Cr. 97, 98–99, 14 P.2d 953, 954 (1932) (citations omitted):

> There are certain matters which cannot always be proven by positive testimony. In a sense it is the proving of a negative. Thus in this case the state seeks to prove that the B.F. Smith, from whom defendant claims to have received the check in question, was a myth, a fictitious person. How is the nonexistence of such claimed person to be proven? The state would not be able to produce a witness who could testify of his own knowledge there was no such person. The most it could prove was that the witnesses were in a position to know the people of the community and knew of no such person; that is, that they did not know of such a person, and no one had told them of such a person being in the community. That is really the purport and effect of the testimony here. The substance of the witness' testimony is that in his opinion

no such person exists; his opinion is based on the one fact that he made inquiry in the neighborhood where such a person, if he existed, should be known, and was not able to learn of any such person. Testimony of the nonexistence of a claimed person is a matter of opinion, which may be based on what is usually termed hearsay. Such testimony is not strictly speaking hearsay, but circumstantial evidence tending to prove that the claimed individual had no existence in fact.

See also *Jendresak v. Metropolitan Life Insurance Co.*, 330 Ill.App. 157, 171, 70 N.E.2d 863, 869 (1946); *State v. DePietro*, 243 La. 897, 902, 148 So.2d 593, 594–95 (1963); *People v. Sharp*, 53 Mich. 523, 525, 19 N.W. 168, 169 (1884). Writers on evidence support this view. 5 J. Wigmore, *Evidence* § 1414(2), at 238 (J. Chadbourn rev. 1974); *McCormick's Handbook of the Law of Evidence* § 249, at 593–94 (2nd ed. E. Cleary 1972). We do not find error in the admission of this testimony.

II. *Defendant's prior writings.* Endeavoring to establish that defendant forged the life insurance application and premium check, the State desired to corroborate the testimony by showing that defendant was skilled by past performance in writing other persons' names. It called Judy Ellen Kern, defendant's former wife, and offered her testimony that she had seen defendant use different types of handwriting by signing various names to insurance applications and premium checks. Defendant objected to this testimony, but the trial court let it in. Defendant claims error.

■ Testimony of this character, disclosing other crimes, is ordinarily inadmissible. *State v. Garren*, 220 N.W.2d 898, 900 (Iowa 1974). The root of the objection to such testimony, however, is *irrelevancy*: that an individual held up a bank last year, for example, does not prove he held up this bank.

■ Where the prior incident is *relevant* to the present inquiry the situation is different. *State v. Powell*, 256 N.W.2d 235, 237 (Iowa 1977) ("some fact relative to the

crime"); *State v. Johnson*, 224 N.W.2d 617, 620 (Iowa 1974) ("some essential fact in issue"). The testimony of Judy Ellen Kern tended to prove defendant's ability to imitate signatures as the State claimed—and defendant had Ady's authentic cancelled check to work from. The evidence came within the relevancy definition and was admissible. *See Carson v. Mulnix*, 263 N.W.2d 701, 706 (Iowa 1978) ("Basic test of relevancy is whether challenged evidence makes the desired inference more probable than it would be without evidence and this determination is a matter for exercise of the trial court's discretion."). The trial court could also find that prejudice did not outweigh the probative value of this testimony. *State v. Cott*, 283 N.W.2d 324, 329 (Iowa 1979). We find no error.

III. *Statements of Judy Kay Kern.* Defendant and Judy Kay Kern, his present wife, were tried together. Three State's witnesses, Edgeton, Jutte, and Jeanne Jensen, gave testimony about statements Judy made. Defendant contends that this testimony was hearsay and it also violated his right of confrontation, since Judy did not take the stand. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ The testimony in question is of two kinds. One kind relates to statements Judy made which inculpated her but not defendant. These were of course admissible against her as admissions, *State v. Ritchison*, 223 N.W.2d 207, 212 (Iowa 1974), and the jury was both admonished and instructed to consider them only against her. That particular testimony did not implicate *Bruton* because it did not inculpate defendant. *Cf. Bruton*, 391 U.S. at 124, 88 S.Ct. at 1621, 20 L.Ed.2d at 478 ("A postal inspector testified that Evans orally confessed to him that Evans *and petitioner* committed the armed robbery." (Emphasis added.)).

■ The other testimony of Judy is similar to that of Olga Jensen, Lebre, and Gearhart which we have considered. It involved statements by Judy, one of the conspirators, during the life of the conspiracy and in furtherance of its objects. Although this testimony inculpated defendant, it was admissible under the conspiracy exception and for that reason did not violate defendant's right of confrontation. *Dutton v. Evans*, 400 U.S. 74, 87–89, 91 S.Ct. 210, 219–20, 27 L.Ed.2d 213, 226–27 (1970). This testimony was not only admissible against Judy but also against defendant himself, whether he was tried jointly or separately. We find no ground for reversal here.

IV. *Instructions.* Defendant objects to the trial court's instructions on aiding and abetting and on joint criminal conduct, as he did in the trial court. The court submitted these two theories of the case as alternatives.

A. Defendant's objection to the customary aiding and abetting instruction given by the court was that it did not contain a clause to the effect the mere presence at or proximity to a crime scene is not sufficient to convict, and it did not identify the principal by name—Oglevie.

■ Defendant's contention as to presence or proximity is correct as an abstract legal principle, but courts are required to tailor instructions to the evidence. *State v. Scovill*, 224 N.W.2d 221, 223 (Iowa 1974); *State v. LaMar*, 210 N.W.2d 600, 605–06 (Iowa 1973). No evidence placed defendant at or in proximity to the homicide scene.

■ The other contention would have required the State to establish the killer's identity. Under the aiding and abetting alternative, this was not necessary in order to convict defendant by reason of section 703.1, The Code 1979:

All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals. The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part he or she had in it, and does not depend upon the degree of another person's guilt.

*See State v. Watson*, 242 N.W.2d 702, 706 (Iowa 1976); *State v. Wilson*, 236 Iowa 429, 444–45, 19 N.W.2d 232, 239 (1945); J. Yeager & R. Carlson, 4 *Criminal Law and Procedure* § 62 (1979). *See also United States v. Frye*, 548 F.2d 765, 768 (8th Cir. 1977). Nor does section 703.2 impose a requirement that the identity of the principal be established.

■ B. Another instruction and an instruction on the alternatives dealt with joint criminal conduct under section 703.2 of the Code:

> When two or more persons, acting in concert, knowingly participate in a public offense, each is responsible for the acts of the other done in furtherance of the commission of the offense or escape therefrom, and his or her guilt will be the same as that of the person so acting, unless the act was one which the person could not reasonably expect to be done in the furtherance of the commission of the offense.

Section 702.13 defines participating in a public offense:

> A person is *"participating in a public offense,"* during part of the entire period commencing with the first act done directly toward the commission of the offense and for the purpose of committing that offense, and terminating when the person has been arrested or has withdrawn from the scene of the intended crime and has eluded pursuers, if any there be. A person is "participating in a public offense" during this period whether the person is successful or unsuccessful in committing the offense.

Defendant first contends that the evidence will not support a finding that he "participated" in the homicide. He did, however, help prepare the lines to tie up the Jensens and he brought Oglevie to West Branch as the first leg of the events culminating in Ady Jensen's death, and this brought section 702.13 into play. The court rightly submitted joint criminal conduct as an alternative.

■ Defendant argues that the instruction on joint criminal conduct should have

named Oglevie, but we reject the argument for reasons already given. He also argues that the court erroneously included the words, "or escape therefrom," in copying section 703.2. We may agree that these words should not have been included, but we cannot see how defendant could possibly have been harmed by their inclusion. *See State v. Gibb*, 303 N.W.2d 673, 686 (Iowa 1981) (question of prejudice under erroneous instructions). We find no cause for reversal in these instructions.

■ V. *Sufficiency of evidence.* Last, defendant contends that the evidence is insufficient to support his first-degree murder conviction and that Jeanne Jensen's testimony was not sufficiently corroborated. We recently repeated the principle that "this court views the evidence in a light most favorable to the State. All legitimate inferences which may fairly and reasonably be deducted therefrom will be accepted." *State v. Schrier*, 300 N.W.2d 305, 306 (Iowa 1981). Applying that principle, we find the direct and circumstantial evidence abundant to support the guilty verdict.

■ As to corroboration of Jeanne Jensen, rule 20(3) of the Rules of Criminal Procedure states:

> *Corroboration of accomplice or person solicited.* A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

We have stated, "All that is [required] is that the [accomplice] be corroborated in some material fact, which tends to connect the defendant with the crime, and therefore supports the credibility of the [accomplice] testimony." *State v. Harrington*, 284 N.W.2d 244, 248 (Iowa 1979) (brackets in original). The various pieces of evidence which the prosecution wove together to show the full picture not only corroborated Jeanne Jensen fully but also developed a

very strong case against defendant. The evidence satisfies the requirement of rule 20(3).

Defendant had a fair trial, and he was thoroughly and vigorously represented in both the trial court and this court. We find no reason to overturn the judgment and sentence.

AFFIRMED.